**United States District Court**
**Eastern District of Michigan**
**Southern Division**

| | |
|---|---|
| United States of America, | Criminal No. 17-20184 |
| Plaintiff, | Hon. Judith E. Levy |
| v. | |
| D-2 Edward Tavorn, | |
| Defendant. | |

_____/

## Government's Sentencing Memorandum

### I.      Introduction

Defendant Edward Tavorn is the admitted and convicted leader of YNS. Under his leadership, the gang terrorized the poor and vulnerable of Brightmoor for years. Tavorn commanded others to commit murders, shootings, armed robberies, home invasions, drug deals, witness intimidation, and obstruction of justice.

Tavorn became the respected and feared leader of these young men because he led by example. He proudly wears the evidence—three tear drops for three murder victims—on his face. He brazenly broadcast his control over the neighborhood, and the _fact_ that he has killed anyone who dared to disrespect him. Nothing could deter him. Not his dozens of arrests. Not being on the receiving end of multiple shootings. Even when the federal authorities arrested Tavorn, he exerted his control over the gang and repeatedly obstructed this federal case.

The Court heard from a few of the survivors. Others were too afraid to come forward. For all the victims, the Court should sentence Tavorn to 19 years in prison.

1

## II.    Facts

### Tavorn pleads guilty and admits he was a YNS leader

In his plea agreement, Tavorn admitted to his key leadership role in the violent YNS enterprise. (ECF No. 503: Rule 11 plea agreement). He specifically agreed that he was a leader and organizer and to the 4-point enhancement under USSG § 3B1.1(a). (*Id.*, 7268). His gang (1) "regularly committed robberies . . . while armed, but sometimes would commit unarmed robberies that involved beating their victims." (*Id.*, 7255). They (2) would "break into houses or gain entry at gunpoint and rob victims in the victims' homes." (*Id.*). Tavorn admitted that his gang (3) "especially encouraged its members to find firearms to steal, because such firearms could then be used by YNS for future acts of violence and to protect its drug trade." (*Id.*). One example was on May 23, 2016, when YNS members robbed two individuals at gunpoint on Beaverland Street, in Brightmoor to obtain firearms. (*Id.*, 7257). One of those victims testified at trial about the gang holding him and his wife at gunpoint and telling them "I have to kill you now because you've seen my face." (ECF No. 491: 2/26/2020 Trial Tr., 6384). The victims were a jammed gun away from a YNS member blowing them away in the basement of their own home. (*Id.*). Tavorn approved and directed that home invasion so the gang could get guns. (ECF No. 489: 2/26/2020 Trial Tr., 5878-81; ECF No. 490: 3/1/2020 Trial Tr., 6136).

Tavorn's gang (4) "cultivated a reputation for ruthless violence" by "committing crimes including assault, arson, attempted murder, and murder." (Rule 11, 7254-55). Their acts made (5) "YNS a group to be feared and not to be crossed[.]" (*Id.*, 7255). The

gang (6) "strictly forbade any cooperation with law enforcement. Gang leadership would confer with members facing charges in order to determine whether any other member might be 'snitching,' or cooperating." (*Id.*). Tavorn made sure that (7) members and associates of YNS "understood that, if they were to provide information about YNS to the police, they would not only lose standing in the gang but also be subject to retaliation up to and including death." (*Id.*).

Tavorn (8) "held a leadership position in the gang from its inception" that allowed him to "enjoy[] the respect and deference of more junior members/associates." (*Id.*). The gang (9) "understood that, if they were to provide information about YNS to the police, they would not only lose standing in the gang but also be subject to violent retaliation up to and including death." (*Id.*). Tavorn went further and agreed that he had obstructed the case and conceded the 2-point adjustment under USSG § 3C1.1. (*Id.*, 7268). After the grand jury indicted him here, he (10) repeatedly directed others to remove and destroy highly relevant evidence in this case. (*Id.*, 7258).

Tavorn (11) possessed several guns during his gang and drug activities. (*Id.*, 7256-58). He was also (12) involved in the distribution of large amounts of crack. (*Id.*, 7259).

**Trial evidence**

The trial began January 27, 2020. (1/27/2020 Minute entry). On March 12, 2020 after the seventh week of trial, Tavorn and his codefendants pleaded guilty to the RICO conspiracy. (ECF No. 503: Rule 11 plea agreement; R. 506: Plea Hr. Tr.). During trial, the government presented dozens of witnesses and hundreds of exhibits detailing the gang's murders, shootings, armed robberies, arsons, home invasions, practice of witness

intimidation and obstruction, and extensive drug dealing. The seven weeks of evidence (and there was more to come) supported every admission in the Rule 11, and then some.

Here are just a handful of the YNS crimes involving Tavorn.

### *Tavorn shoots L.F. while T.P.'s children ride their bikes on the street*

On June 13, 2015, police arrested Tavorn in connection with his shooting of L.F. (PSR ¶ 68). The evidence at trial showed that Tavorn had several guns leading up to the shooting and used at least one of them to shoot L.F. that day.

Here are some of the photos from the days just before and on the shooting. The Court saw several others, plus videos. (ECF No. 464, Trial Tr. 2/06/2020; ECF No. 461, Trial Tr. 2/07/2020, Exhibits 20.0001 through 20.097).






DPD recovered more than 20 shell casings from Tavorn's shooting on Braile. (ECF No. 464, Trial Tr. 2/06/2020). Here is a diagram from the trial, with casings in red.



"The officers found the victim with a gunshot wound in his left arm. The victim and a witness reported the victim was shot by the driver of a white Dodge Charger." (PSR ¶ 68). The shooting victim even picked Tavorn from a photo array but was too

afraid to testify out of fear of YNS retaliation. The victim, L.F., had made the near-fatal mistake of "disrespecting" Tavorn. His act of disrespect was asking Tavorn to stop speeding up and down the street in his car while the children were playing in the street.



The shooting victim even picked Tavorn from a photo array but was too afraid to testify out of fear of YNS retaliation. L.F. was not Tavorn's only victim. T.P. was a mother who suffered through this shooting because her children were outside trying to ride their bikes when Tavorn recklessly fired his gun, shot L.F., and sprayed gunfire all over that street. (ECF No. 461, Trial Tr. 2/05/2020, 4355-80). T.P. described the terrifying day.

21  Q.   Okay.  So what stands out in your mind from June 13th of

22  2015?

23  A.   There was a shooting.

24  Q.   And where were you during the shooting?

25  A.   In the house.

---

1   Q.   And what, what did you hear?

2   A.   Gunshots.

3   Q.   Gunshots and where were your children at this point?

4   A.   Umm, one of them was outside.

5   Q.   And were they outside on the street?

6   A.   Sidewalk.

7   Q.   And when you heard these gunshots, where -- did they sound

8   close by?

9   A.   Um-hmm, yes.

10  Q.   Okay, so how far away would you say the gunshots were that

11  you heard?

12  A.   Right outside.

13  Q.   So right outside your house?

14  A.   Um-hmm.

15  Q.   Near Braile and Midland?

16  A.   Yes, um-hmm.

17  Q.   And approximately how many gunshots did you hear?

18  A.   The approximate amount I don't know.  About 15, 20.

19  Q.   Okay.  You mentioned that your daughter was outside?

20  A.   Yes.

21  Q.   How old was she at the time?

22  A.   Five.

23  Q.   And was she playing with any other children outside?

24  A.   Yes.

25  Q.   Where were the children?

```
1    A.   Like spreaded out.  They were not in a designated area.
2    They was riding their bikes so they was like up and down the
3    street.
4    Q.   Up and down the street, okay.  On Braile?
5    A.   Yes.
6    Q.   And do you remember seeing anyone else on the street
7    besides the children?
8    A.   Yes.
9    Q.   What do you remember?
10   A.   I mean, it was the, it was the summertime so people was
11   just outside.  There was people out.
12   Q.   And do you remember after you heard the shots, what did
13   you do?
14   A.   Run outside to get my daughter.
```

Tavorn was the shooter and he perfectly matched the description of the man with a "big" "black" gun, "red shirt," "red hat," and driving a "white Charger." (ECF No. 461, Trial Tr. 2/07/2020, 4368-69). Here is clip of Tavorn with his black gun from a video just before he shot L.F.



This is a photo of Tavorn from the day of the shooting, with his red shirt, sitting on his white Charger, and two DPD photos of Tavorn's car after the police chase, one with his red hat. Tavorn recklessly smashed his car across the lawn and directly at a home.

 



(Trial Exs. 20.021, 20.052, 20.053).

Tavorn was so bold he even narrated this high-speed chase in his Mobbin with the Mobb YouTube video, and pointed out the location of the chase and car crash.



(Trial Ex. 24.001, 24.004).

### *The Victory Inn—when Tavorn threatens to kill anyone who talks about the brutal murder of a random woman*

A few weeks after Tavorn's June 13, 2015 shooting of L.F., Tavorn, George Eubanks, and several other YNS members were together partying again on Braile on July 4, 2015. That same day, some of them went to the Victory Inn and murdered a woman, E.B., during an armed robbery. Here is a photo of Tavorn, Eubanks, and some of the YNS murderers earlier that day.



Three YNS members—Chiram Armstead, Johnny Davis, and Kyle Kelly—were convicted of murdering and torturing E.B. later that day in Brightmoor.  (ECF No. 487: 2/19/2020 Trial Tr., 5538, 5549; Stipulation 34).  Under Tavorn's leadership and neighborhood control, these young YNS gang members were so emboldened they broke right into E.B.'s hotel room.



(Trial Ex. 21.007).

YNS's murder scene was so gruesome that the parties agreed to cut the video portion that showed the murder. The Court heard the 911 call that captured E.B.'s final moments at the hands of YNS. (Trial Ex. 21.005).



(Trial Ex. 21.003).

E.B. was waiting for a job interview and happened to have rented a hotel room in YNS's gang territory. She paid with her life.





(Trial Exs. 21.010, 21.011).

The next day, hours after Armstead and the other YNS members murdered E.B., Tavorn was again hanging with Armstead at the Coney Island that Tavorn controlled. Tavorn made sure to throw up the YNS gang symbol and sign with Armstead the morning after the YNS murder of E.B.



(Trial Ex. 21.022A, 21.022C).

After police arrested YNS members Armstead, Kelly, and Davis, Tavorn and Eubanks attempted to obstruct the YNS murder case. Tavorn and Eubanks actively engaged in witness tampering after the gang's brutal murder of E.B.—who they referred

to as "that b*tch"—at the Victory Inn hotel in the gang's territory. (ECF No. 487: 2/19/2020 Trial Tr., 5625-40, Ex 23.001A-D). Tavorn was so upset that a fellow gang member might talk on the YNS murderers that he threatened to kill the "snitches" on the July 28, 2015 jail call. (ECF No. 487: 2/19/2020 Trial Tr., 5630, Trial Ex. 23.001). Tavorn told Davis on that call that "Yeah. All right. They, they, they through. They, they, they, they through . . . I'm mad as hell, dog. I'm gonna [U/I], I wanna kill one of them niggas. Yeah, I'm mad as hell, dog." (Trial Ex. 23.001).

> ### Tavorn directs the YNS home invasion on Beaverland— where young YNS members try to kill D.M. and his wife

On May 23, 2016, YNS members robbed two individuals at gunpoint on Beaverland Street, in Brightmoor to obtain firearms, a key objective of YNS. (Rule 11, 7257). Here is the passage to the basement where Tavorn's underlings went to kill these two random victims.



(Trial Ex. 27.020).

One of those YNS victims, D.M., testified at trial about the gang holding him and his wife at gunpoint in their basement and telling them "I have to kill you now because you've seen my face." (ECF No. 491: 2/26/2020 Trial Tr., 6384). If not for the YNS gang member's jammed gun, and D.M.'s quick life-saving action, YNS would have left two more murder victims in Brightmoor with this terrible scene of bullets, guns, and blown-out windows.

 



(Trial Exs. 27.020).

Tavorn approved and directed this home invasion so the gang could get guns. (ECF No. 489: 2/26/2020 Trial Tr., 5878-81; ECF No. 490: 3/1/2020 Trial Tr., 6136). Here is Tavorn with one of the young gang members, Davon Miller, convicted of the crime Tavorn directed.





(Trial Exs. 27.048; 24.023).

Tavorn's young gang underlings got convictions and are serving decades in prison. Tavorn's victims were a jammed gun from YNS murdering them in their basement. Tavorn was the only one who did not suffer the fallout from his plans.

*Tavorn directs another young YNS member to commit armed robbery*

Once more on Braile in the heart of Brightmoor, Tavorn casually directed a young

gang member to do violence for Tavorn's gain. It was a common scene of gambling on

Braile.




(Trial Exs. 1.026; 1.033).

This was Tavorn's territory and the same street where Tavorn shot L.F. while

T.P.'s children played on his street.

A young YNS gang member explained how he was told to rob another man and so he "started pistol whipping him with the gun, robbed him." (ECF No. 471: 2/14/2020 Trial Tr., 5125). Then Tavorn ordered the young gang member to "pay homage" and give proceeds of the armed robbery to Tavorn. (*Id.*, 5127).

### *Tavorn directs convicted YNS murderer Armstead to murder rivals*

Tavorn also directed young YNS gang members like Armstead, a/k/a "Wood" (one of the murderers from the Victory Inn) to carry out hits—directed murders—on rivals.  (ECF No. 489: 2/24/2020 Trial Tr., 5986-88). Armstead said that Tavorn "gave me three [thousand dollars] to put a n*gga on a shirt." (*Id.*, 5987). Putting someone on a shirt is slang for "murder." (*Id.*). Armstead also did at least one other hit for Tavorn, this one for $5,000. (*Id.*, 5990-92).

Here is one of many photos of Tavorn and Eubanks with Armstead.



(Trial Ex. 20.078).

These "hits" are one example of what Tavorn bragged about on YouTube when he said ""I don't f*ck with outsiders . . . you disrespect, you gotta go."



(Trial Exs. 24.001 at 22:38; 24.032).

When Tavorn said "we [YNS] killing anything that disrespect us," he was telling the truth.



(Trial Exs. 24.001 at 00:11; 24.002).

*Tavorn carries loaded guns*

Tavorn truthfully said he was always "strapped." (Trial Ex. 24.001). The police caught him several times with some of his loaded guns. Here are a few examples of the loaded guns police found when they arrested him—all in Brightmoor.

*Police arrested Tavorn with this gun on October 20, 2006.*



(Trial Ex. 9.004).

*Police arrested Tavorn with this gun on June 20, 2008.*



(Trial Ex. 11.004).

*Police arrested Tavorn with this gun on May 14, 2010.*



(Trial Ex. 13.004).

*Police arrested Tavorn with this gun on May 8, 2017.*



(Trial Ex. 32.005).

### *Tavorn's teardrop murders*

Tavorn did not just carry loaded guns. He used them to shoot and kill people. He proudly boasted of his three teardrop tattoos. Each teardrop represents a murder. (ECF No. 470: 2/13/2020 Trial Tr., 5035) ("Q. And do those tattoos have a common meaning? A. Teardrop meaning you killed somebody.").



(Trial Ex. 30.005).

Tavorn directly said that "these count for something." Murders.



(Trial Exs. 24.001 at 16:43; 24.017).

One of Tavorn's teardrop murders was a retailatory gang shooting that he described in his confessional video. "I ended up catching up with that n*gga, you know where he at . . . I am still here . . . and dog ain't nowhere around."



(Trial Exs. 24.001 at 16:43; 24.017).

*Tavorn uses this violence to control Brightmoor*

Tavorn controlled the gas station.



(Trial Exs. 24.001 at 18:42; 24.021).

Tavorn controlled the Coney Island.



(Trial Exs. 24.001 at 18:37; 24.019).

Tavorn controlled the party store and the "little homies."

 

(Trial Exs. 24.001 at 18:39; 24.020; 1.046).

*Tavorn's violence and guns were real*

With the evidence above, Tavorn proved that he was not just bragging when he said:

- "we killing anything that disrespect us"

- "we got the killas everywhere"

- "we all strapped [armed with guns]"

- "we started shooting n*ggas up"

- "YNS . . . now we running this bitch"

(ECF No. 453: 1/28/2020 Trial Tr. 3495-96, Ex 24.001; R. 95-99: Response to Motion for Revocation and Exhibits). The Court was repeatedly viewed the full video.

The same is true with his hundreds of photos and videos with guns. They were all real. (ECF No. 489: 2/24/2020 Trial Tr. 5890; ECF No. 470: 2/13/2020 Trial Tr. 5004-05). Here are just a few of those that the government presented at trial.

 

 







(Trial Exs. 1.006, 1.058, 1.104, 1.112, 24.001).

*Tavorn made cash from these gang crimes*

Unlike the young gang members under Tavorn's thumb, Tavorn made and displayed large amounts of cash over several years. He admitting to selling a huge amount of crack. (Rule 11, 7259). There are dozens of postings and examples of his drug money. Here a just a few. The Court saw these and many others during trial.

 

 











(Trial Exs. 1.019, 1.030, 1.037, 1.040, 1.041, 1.048, 1.059. 1.062. 1.084, 1.089).

*Tavorn continues to commit federal crimes after his arrest and while detained in this case*

Tavorn did not stop committing federal crimes after his arrest. He quickly acted to obstruct the case before this Court by directing other gang members to destroy key evidence. (Rule 11, 7258). He admitted to obstructing justice. (*Id.*, 7268).

He then sent Eubanks on an out-of-state mission to raise Tavorn's "lawyer money" with codefendant James Bowens. Tavorn repeatedly communicated and directed drug dealing in West Virginia. West Virginia police then arrested Eubanks and Bowens with 1.2 pounds of crack cocaine and two loaded guns. (ECF No. 501: 3/11/2020 Trial Tr., 7200-01, 7204, 7206-07, Ex 34.001)  Here are photos of the crack and guns—including one with rubber bands on the grip to prevent fingerprints:






(Trial Exs. 46.003, 46.013, 46.017).

### *Witness intimidation during trial*

The gang's witness intimidation and obstruction continued during trial. Two of YNS's shooting victims were too afraid to testify against the gang. (ECF No. 489: 2/24/2020 Trial Tr., 5803). A veteran police officer from Brightmoor received a texted death threat within 36 hours of disclosure of his name as a witness. (*Id.*). The gang communicated threats to two cooperating witnesses and family. (*Id.*, 5803-04). One defendant sent a message that scared one of the cooperating witnesses into first pretending during his testimony that he did not even know them. (*Id.*, 5825-28). YNS

gang associates pressed into the courtroom, whenever cooperating witnesses were testifying. (*Id.*, 5804-08). These acts led the Court to express "serious concerns" about defendants' witness intimidation:

> [W]e do have some serious concerns. There's part of the indictment [that] has an obstruction issue. I mean, all of the things that were listed yesterday at the beginning of the day about [the law enforcement deputy who was threatened], two citizen victims refusing to testify now, the contact with [cooperating witness one]'s mother, the—[cooperating witness one]'s change in demeanor. The communication, nonverbal that seemed to go on with Mr. Bowens and his friend.  All these various things . . . But there's enough going on here, jail calls and things where discussions took place about cooperating witnesses. That it's my duty to ensure that everyone is safe in this case and everyone is free to testify.

(ECF No. 490: 2/25/2020 Trial Tr., 6023).

## III.   Advisory Sentencing Guidelines

The parties agreed in the Rule 11 that Tavorn's Guidelines range was 360 months to life in prison (total offense level 40, criminal history category III). (Rule 11, Guideline Worksheet D). The probation department found a higher total offense level of 42 and a criminal history category IV, resulting in the same Guidelines range. (PSR ¶ 122). The Rule 11 requires that the Court sentence Tavorn to at least 168 months (14 years) in prison and caps the sentence at 228 months (19 years). (Rule 11, ¶ 3A).

## IV.   Sentencing Guidelines and other 3553(a) factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence

to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors are evaluated below.

## A.    The advisory Guidelines range

The advisory Guidelines remain an important factor in sentencing. "[I]t is fair to assume that the Guidelines . . . reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 345 (2007).  A district court should begin sentencing proceedings by correctly calculating the guidelines. *United States v. Gall*, 128 S. Ct. 586, 596 (2007).

## B.    Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)

### 1.    Nature of the offense

YNS is a violent street gang. Because of Tavorn's leadership in YNS, he enjoyed the respect and deference of more junior members and associates. Tavorn committed and directed a series of violent crimes including murder. He regularly sold drugs with other YNS members throughout the racketeering conspiracy. He directed Eubanks to extend the enterprise to rural West Virginia where Eubanks and Bowens sold large amounts of crack cocaine for a substantial revenue.

Under Tavorn's leadership, YNS purposefully developed its ruthless reputation by committing violent acts. YNS's domination of the neighborhood caused Brightmoor

residents to live in fear of shootings, robberies, beatings, and arson. YNS forced the community to endure violence, and the regular use of neighborhood businesses and residences as drug markets, because the gang will not tolerate interference with its members' revenues or threats to its dominance. Tavorn said it best and with a smile:

**"Who do you think the bad guys is, behind everything?"**



(Trial Exs. 24.001 at 15:36; 24.015).

We did not learn what constituted "everything" in Brightmoor. But the trial evidence showed enough of Tavorn's violent crime—direct and directed—to give a vivid impression of his impact on the people of Brightmoor. Tavorn's three teardrop murders. Tavorn shooting L.F. while T.P.'s children played on the street. Tavorn's directed home invasion and near murder of D.M. and his wife on Beaverland. Tavorn obstructing and threatening to kill anyone who snitched on his underlings who murdered E.B. at the

Victory Inn. Tavorn directing Armstead to carry out hits for cash. Tavorn ordering another young YNS member to pay "homage" to him after being directed to pistol-whip another man at a dice game.

Like all YNS members, Tavorn is responsible for the foreseeable acts committed by the other members to advance the conspiracy. *United States v. Nicholson*, 716 F. App'x 400, 409 (6th Cir. 2017), c*ert. denied*, 138 S. Ct. 1337 (2018) (applying *Pinkerton v. United States*, 328 U.S. 640, 646-48, (1946) to RICO coconspirators). *See also United States v. Corrado*, 286 F.3d 934, 937 (6th Cir. 2002) (in a "RICO enterprise . . . 'the supporters are as guilty as the perpetrators . . . so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators.'") (quoting *Salinas v. United States*, 522 U.S. 52, 63-64 (1997)). This includes countless other acts of violence and drug dealing.

These are exactly the harms that "contribut[e] to the economic and social decline of [gang-dominated] neighborhoods" and "caus[e] fear and lifestyle changes among law-abiding residents." *City of Chicago v. Morales*, 527 U.S. 41, 98-99 (1999) (Thomas, J. dissenting) (quoting U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Assistance, Monograph: Urban Street Gang Enforcement 3 (1997)). "Gangs fill the daily lives of many of our poorest and most vulnerable citizens with a terror . . . often relegating them to the status of prisoners in their own homes." *Id.* (citing U.S. Dept. of Justice, Attorney General's Report to the President, Coordinated Approach to the Challenge of Gang Violence: A Progress Report 1 (Apr.1996)) ("[For] the families who are hostages within their homes, living in neighborhoods ruled by predatory drug trafficking gangs, the harmful impact of gang violence . . . is both physically and

psychologically debilitating"). As the PSR noted, "YNS terrorized and violated the Brightmoor neighborhood for years. In addition, narcotics trafficking destroys neighborhoods and communities with the violence and addictions it brings." PSR ¶ 139.

The residents of Brightmoor were the primary victims of YNS's violent dominion throughout the decade-long racketeering conspiracy. This vulnerable neighborhood has suffered tremendous population loss and is one of the poorest neighborhoods in Detroit.[1] One 2016 article noted the contrast between the developing areas of Detroit and Brightmoor and found that "[e]ven with a depleted population, crime is still a big issue in this neighborhood[.]"[2] Tavorn's conduct, and of the gang members under his leadership, contributed directly to Brightmoor's high crime rate and its status as "one of the most blighted areas in Detroit."[3]

## 2. History and characteristics

At the age of 33, Tavorn has already compiled a significant criminal history. Here, he pleaded guilty to a RICO conspiracy centered on violence and drug distribution. YNS has committed a host of violent crimes, including murder, robbery, and home invasion.

---

[1] *See* Data Driven Detroit, *Brightmoor Neighborhood Profile* (April 2012). https://ssw.umich.edu/sites/default/files/documents/research/projects/good-neighborhoods/brightmoor-profile-2013-081913.pdf

[2] *See* "*Detroit's most dangerous neighborhoods still struggling during city's comeback*" (February 17, 2016). https://www.mlive.com/news/index.ssf/2016/02/detroits_most_dangerous_neighb.html

[3] *See* "*Detroit area's battle with blight may be key to survival*" (July 25, 2013). https://www.reuters.com/article/us-usa-detroit-blight/detroit-areas-battle-with-blight-may-be-key-to-survival-idUSBRE96O02T20130725

Tavorn has several convictions. (PSR ¶¶ 60-69). These include multiple convictions for fleeing from police, drugs, and assaulting/resisting/obstructing police. (*Id.*). The court gave him a break in 2007, and sentenced him to probation under HYTA. (*Id.*, ¶ 60). He violated that probation and served two months in jail. (*Id.*). For his next six convictions, he served about 150 days in total. (*Id.* ¶¶ 60-67). On June 13, 2015, police arrested him in connection with his shooting of L.F. (*Id.*, ¶ 68). On September 3, 2015, he was convicted of three crimes stemming from his flight from police after that shooting. (*Id.*). The PSR provides details consistent with the trial evidence. "The officers found the victim with a gunshot wound in his left arm. The victim and a witness reported the victim was shot by the driver of a white Dodge Charger. The vehicle also had a passenger in the front seat. Both occupants were wearing red shirts. This information was broadcasted to other officers. Nearby, two other Detroit police officers observed a white Dodge Charger and followed to investigate. The Charger accelerated at a high rate of speed and disregarded a red light at Schoolcraft Road. The vehicle then crashed into a parked vehicle on Burt Road. The driver of the vehicle, later determined to be Tavorn, got out of the vehicle and fled on foot. After a short foot chase, Tavorn was arrested. On the driver's side floorboard officers found crack cocaine." (*Id.*). Tavorn was sentenced to only 5 months in jail and probation. (*Id.*). He *repeatedly* violated his supervision. (*Id.*). He still has an active warrant for probation violations. (*Id.*).

Police arrested him another 22 times and he was on probation when he committed many of the crimes in this case. (*Id.*, ¶¶ 70-84). His arrests were for crimes

including domestic violence, drugs, burglary, four weapons-related crimes, and stolen vehicle. (*Id.*).

These are not his only crimes and convictions. Tavorn posted videos where he described some of his other crimes in detail. Shootouts, drug dealing, controlling the neighborhood, and murders. As the trial proved, his crimes and victims were real.

## C. Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)

The advisory Guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct. Tavorn is a leader of an extremely violent and murderous gang. He has proven that he has no respect for the law and that nothing will deter his criminal gang actions. Dozens of arrests and lenient sentences have emboldened him to the point that he posted videos bragging about his gang crimes—including murders. Tavorn's actions after his arrest in this case were the most telling facts. While detained, he repeatedly directed gang members to destroy crucial evidence, and directed them to sell large amounts of drugs in West Virginia on his behalf.

## D. Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C)

Deterrence is especially important in this case. In the past, courts gave Tavorn breaks and he has served little time considering his criminal history. He responded by committing new crimes while Brightmoor suffered. The Court should impose a sentence that protects the public generally and the people of Brightmoor specifically. The Court must deter Tavorn from guns, murders, violent robberies, shootings, drug dealing, and

his role as the leader of the decade-long YNS criminal enterprise. Too many victims have suffered because of Tavorn.

## V.      Conclusion

The government recommends that the Court impose a sentence of 19 years to reflect the loss of life at Tavorn's hands, and the real damage he caused to YNS's victims, their families, and the community.

Matthew Schneider
United States Attorney

*s/ Jerome F. Gorgon Jr.*
JEROME F. GORGON JR.
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9676
jerome.gorgon@usdoj.gov

Dated: September 22, 2020

**Certificate of Service**

I hereby certify that on September 22, 2020, I electronically filed the foregoing document with the Clerk of the Court that will provide a copy of such filing to the attorney of record, Sanford Schulman.

/s Jerome F. Gorgon Jr.
JEROME F. GORGON JR.
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 226-9676
jerome.gorgon@usdoj.gov