United States District Court
Eastern District of Michigan
Southern Division

| | |
|---|---|
| United States of America, | Criminal No. 17-20184 |
| Plaintiff, | Hon. Judith E. Levy |
| v. | |
| D-6 George Eubanks, | |
| Defendant. | |

## Government's Sentencing Memorandum

Defendant George Eubanks is a convicted leader of the violent YNS gang. For a decade, his gang terrorized the beleaguered Brightmoor neighborhood of Detroit. Eubanks expanded the enterprise to rural West Virginia, where police arrested him for 1.2 pounds of crack and two loaded guns. Because of his dangerousness, he was detained pending his trial here on charges for RICO conspiracy, crack-cocaine trafficking conspiracy, possessing a gun in furtherance of his drug crimes, evidence tampering, and obstruction.

After the seventh week of a trial riddled with threats against witnesses, Eubanks gave up the presumption of innocence and pleaded guilty. He admitted to being a leader in the RICO conspiracy—replete with murders, shootings, armed robberies, arson,

1

home invasions, and more witness intimidation. He faces a guideline range of up to life in prison, and a floor on his sentence of at least 14 years in prison.

Eubanks occupied a unique role in the YNS gang; so high ranking, and so trusted, that the most sensitive tasks became his responsibility. When YNS members brutally murdered an innocent woman, Eubanks worked to identify the cooperating witnesses. When YNS leader Edward Tavorn was jailed and needed money for a lawyer, Eubanks traveled to rural West Virginia and there, armed, pushed crack-cocaine on a vulnerable population, among the hardest hit by the opioid epidemic.

For the reasons that follow, the Government requests that this Court impose a sentence of 228 months (19 years) in custody.

## I. Trial evidence

The trial began January 27, 2020. (1/27/2020 Minute entry). In his opening statement, Eubanks' attorney proclaimed: ". . . he sells marijuana. You'll hear evidence of that. And he owns it. But crack-cocaine he does not." (R. 453: 2/2/2020 Trial Tr., 3433). However, on March 12, 2020, after the seventh week of trial, Eubanks and his codefendants pleaded guilty to the RICO conspiracy. (R. 504: Rule 11 plea agreement; R. 506: Plea Hr. Tr.). During trial, the government presented dozens of witnesses and hundreds of exhibits detailing the gang's murders, shootings, armed robberies, arsons, home invasions, practice of witness intimidation and obstruction, and extensive drug

dealing. Notably, in his plea agreement, Eubanks admitted to possessing with the intent to distribute hundreds of grams of crack-cocaine. (R.453, PageID.3417).

Eubanks repeatedly possessed loaded firearms and made threats to promote the enterprise. Here a few examples of the photos and videos from the trial.










(R. 455: 1/30/2020 Trial Tr., Ex 2.005, 2.007, 2.010, 2.019, 2.021, 2.022).

Eubanks played a prominent role with coleader Tavorn in promoting the gang's violence in a YouTube video entitled "Glo-Gang-Member YNS Cheeks – Mobbin with Da Mobb." Here are a few screenshots.

  

In the video, the gang bragged about its violent grip on Brightmoor.

- "we killing anything that disrespect us"
- "we got this b**** on lock"
- "we got the killas everywhere"
- "we all strapped [armed with guns]"
- "we started shooting n****s up"
- "my gang members around here, we are everywhere"
- "we got the liquor store, Coney Island, gas station"
- "YNS . . . now we running this b****"

(R. 453: 1/28/2020 Trial Tr. 3495-96, Ex 24.001; R. 95-99: Response to Motion for Revocation of Detention and Exhibits).

5

Eubanks actively engaged in witness tampering after the gang's brutal murder of a random woman—who he referred to as "that b****"—at the Victory Inn hotel in the gang's territory. (R. 487: 2/19/2020 Trial Tr., 5625-40, Ex 23.001A-D). He did this after learning of the horrific nature of the gang's murder of the woman, captured in part on this 911 call:



(R. 487: 2/21/2020 Trial Tr., 5584, Ex 21.005).

While Eubanks was on an out-of-state mission to raise "lawyer money" for his codefendant (the gang's leader), West Virginia police arrested him for over 1.2 pounds of crack cocaine and two loaded guns. (R. 501: 3/11/2020 Trial Tr., 7200-01, 7204, 7206-07, Ex 34.001). Here are photos of the crack and his guns—including one with rubber bands on the grip to prevent fingerprints:







**Witness intimidation during trial**

The gang's witness intimidation and obstruction continued during trial. Two of YNS's shooting victims were too afraid to testify against the gang. (R. 489: 2/24/2020 Trial Tr., 5803). A veteran police officer from Brightmoor received a texted death threat within 36 hours of disclosure of his name as a witness. (*Id.*). The gang communicated threats to two cooperating witnesses and family. (*Id.*, 5803-04). Eubanks himself sent a message that scared one of the cooperating witnesses into first pretending during his

7

testimony that he did not even know who Eubanks was. (*Id.*, 5825-28). YNS gang associates pressed into the courtroom, whenever cooperating witnesses were testifying. (*Id.*, 5804-08). Although the defendants claimed not to know those people, court security officers spotted at least one defendant communicating with them. (*Id.*, 5804-05).

These acts led the Court to express "serious concerns" about defendants' witness intimidation:

> [W]e do have some serious concerns. There's part of the indictment [that] has an obstruction issue. I mean, all of the things that were listed yesterday at the beginning of the day about Sheriff Moore, two citizen victims refusing to testify now, the contact with [cooperating witness one]'s mother, the—[cooperating witness one]'s change in demeanor. The communication, nonverbal that seemed to go on with Mr. Bowens and his friend. All these various things . . . But there's enough going on here, jail calls and things where discussions took place about cooperating witnesses. That it's my duty to ensure that everyone is safe in this case and everyone is free to testify.

(R. 490: 2/25/2020 Trial Tr., 6023).

**Eubanks pleads guilty and admits he was a YNS leader**

In his plea agreement, Eubanks admitted to his key role in the violent YNS enterprise. (R. 504: Rule 11 plea agreement). His gang (1) "regularly committed robberies . . . while armed, but sometimes would commit unarmed robberies that involved beating their victims." (*Id.*, 7279). They (2) would "break into houses or gain entry at gunpoint and rob victims in the victims' homes." (*Id.*). Eubanks admitted that

8

his gang (3) "especially encouraged its members to find firearms to steal, because such firearms could then be used by YNS for future acts of violence and to protect its drug trade." (*Id.*). One example was on May 23, 2016, when "three YNS members robbed two individuals at gunpoint on Beaverland Street, in the Brightmoor neighborhood of Detroit . . . for the purpose of obtaining numerous firearms that the perpetrators believed to be present at the location." (*Id.*, 7282). One of those victims testified at trial about the gang holding him and his wife at gunpoint and telling them "I have to kill you now because you've seen my face." (R. 491: 2/26/2020 Trial Tr., 6384).

Eubanks's gang (4) "cultivated a reputation for ruthless violence" by "committing crimes including assault, arson, attempted murder, and murder." (R. 504, 7279). Their acts made (5) "YNS a group to be feared and not to be crossed[.]" (*Id.*, 7280). The gang (6) "strictly forbade any cooperation with law enforcement. Gang leadership would confer with members facing charges in order to determine whether any other member might be 'snitching,' or cooperating." (*Id.*).

Eubanks (7) "held a leadership position in the gang from its inception." (*Id.*). Under his leadership, the gang (8) "understood that, if they were to provide information about YNS to the police, they would not only lose standing in the gang but also be subject to violent retaliation up to and including death." (*Id.*). Eubanks (9) tampered in the brutal gang homicide on July 4, 2015, at the Victory Inn, when he was ferreting out

9

cooperating witnesses for gang retaliation. (*Id.*, 7280). He was also (10) involved in the distribution of large amounts of crack. (*Id.*, 7283).

## II. Advisory Sentencing Guidelines

Although the sentencing guidelines are advisory, the Court must nonetheless begin its sentencing analysis by properly calculating the applicable range a defendant faces. *See United States v. Booker*, 543 U.S. 220, 245 (2005). The advisory Guidelines remain an important factor in sentencing. "[I]t is fair to assume that the Guidelines . . . reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 345 (2007).

Here, the Court has already accepted the Rule 11 Plea Agreement. (3/12/2020 Minute Entry). In it, the parties did not dispute the sentencing guideline range. (R. 504: Rule 11 Plea Agreement, 7284). The parties agree that Eubanks' guideline range is 360 months to life in prison. (*Id.*). Moreover, the Rule 11 Plea Agreement requires the Court to impose a sentence no less than 168 months, and no more than 228 months. (*Id.,* 7285). Consistent with the Plea Agreement, the Government requests this Court impose a sentence of 228 months in prison.

## III. Sentencing Factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of

10

the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors are evaluated below.

### a. Nature and circumstances of the offense, 18 U.S.C. § 3553(a)(1)

The YNS murder at the Victory Inn was heinous and despicable – the individuals who committed the murder are serving life sentences for their crimes. The YNS home invasion and robbery was terrifying (a husband and wife were threatened with death and had a gun pointed at their heads) – similarly, those individuals were sentenced to decades in prison. Both of these violent crimes were committed in furtherance of the YNS gang.

However, the most sinister and troubling aspect of a RICO enterprise comes with the recognition that those types of actions, while appearing unrelated, are in fact crimes in furtherance of the same enterprise.

While a significant portion of the this Sentencing Memorandum outlines the YNS gang activity presented at trial, examining the relationship of the offenses

11

underscores the significant hurdles in successfully prosecuting and dismantling a RICO enterprise.

Take for example the brutal murder at the Victory Inn. After the brutal murder at the Victory Inn, the Detroit Police Department was tasked with solving this murder and within the days immediately following, officers were tracking down leads, attempting to interview witnesses, and gathering evidence. At the same time, the YNS gang, using its structure—including Eubanks—was conspiring to destroy evidence, threaten witnesses, and collect the police reports to make sure the Victory Inn murderers could never be convicted.

But that was not the only time that Eubanks obstructed justice – it occurred in this very trial, as a witness testified to under penalty of perjury:

```
18  A.   He, basically, just said like I found out -- the guys
19       found out that you were supposed to be testifying and whatnot
20       and we want to know what was up with the situation.
21  BY MR. GORGON (Continued):
22  Q.   When he said the guys, who was he referring to?
23  A.   Big G.
24  Q.   Okay.  How did learning that information impact the way
25       you felt when you came in here Thursday?
```

```
1  A.  Because now I felt threatened.
2  Q.  You knew Big G before this case, correct?
3  A.  Yes, sir.
4  Q.  Does Mr. Eubanks know anything about your family
5  relations?
6  A.  Yes, sir.
7  Q.  What does he know?
```

```
7  Q.  And has Big G ever been around any of your family
8  members?
9  A.  Just my baby mother.
10 Q.  Okay.  And this is the woman that you have seven children
11 with, correct?
12 A.  Yes, ma'am -- yes, sir.
13 Q.  And does that information that Mr. G knows who your
14 significant other is, who you have seven children with, concern
15 you?
```

```
1  A.  Yes, sir.
2  Q.  Tell the jury why.
3  A.  Because that's -- I'm not out there to protect my family.
4  They out there by theyself.
```

R.489, PageID.5826-5828.

13

YNS was also involved in drug trafficking. Eubanks and Bowens—at the direction of Tavorn—traveled to rural West Virginia to sell crack-cocaine to pay for Tavorn's attorney in this case. Eubanks and Bowens each used and possessed guns to further their drug trafficking. There, the local law enforcement encounters incredibly large amounts of crack-cocaine. The West Virginia State Police conduct an investigation, interview witnesses, execute warrants, attempting to find out where and how large quantities of drugs and guns are entering their community. At the same time, the leader of YNS, Edward Tavorn, is giving orders to YNS members to sell the crack-cocaine in rural West Virginia. Tavorn gives the orders from a separate state, hundreds of miles away, from a jail cell no less. All so he can retain an attorney to defend himself in Federal Court, charged in this very RICO conspiracy. YNS members' criminal activity reached far beyond Brightmoor. But the gang's involvement did not stop when the crimes were complete. Then, gang members conspired to obstruct justice, conceal evidence, and intimidate witnesses. At the same time, the family members of someone brutally murdered want to know why nobody has been arrested, but local police have no explanation for witnesses refusing to speak to them, and those that do, changing their stories. A rural community destroyed by a drug epidemic, is inundated with hundreds of grams of crack-cocaine, packaged for sale. All because of YNS leaders, including Eubanks.

### b. The history and characteristics of the defendant, 18 U.S.C. § 3553(a)(1)

Eubanks' criminal conduct demonstrates that the sentence sufficient but not greater than necessary, is a sentence of 228 months. Indeed, Eubanks' criminal history spans 7 pages of the PSR. (PSR at ¶¶ 50-82). His extensive criminal history includes drug trafficking (PSR at ¶¶ 50, 59), weapons offenses (PSR at ¶ 54), car chases, fleeing, and eluding (PSR at ¶¶ 53, 55), and forgery (PSR at ¶ 52). Even worse, Eubanks committed many of these crimes while on probation. Eubanks' career in crime spanned multiple years, in multiple states, and ran the entire duration of the YNS RICO conspiracy.

Eubanks' criminal history isn't the only factor weighing in favor of a sentence of 228 months – it is the fact that Eubanks has been offered, multiple times, treatment and restart opportunities. Eubanks ignored them.

In 2008, officers arrested Eubanks, who was carrying a concealed weapon. Eubanks pled guilty. Judge Wade H. McCree sentenced Eubanks to the "JB3" program, which serves as a "cognitive behavior program . . . that prepares the inmate with a resource of cognitive tools along with community-based support programs that are customized to meet individual needs." (PSR at ¶ 54). After the jail sentence, Eubanks had the opportunity to work with community agencies that provided continued service, like employment, substance abuse prevention, housing, and medical/mental health

programs. (PSR at ¶ 54). While it would seem like Eubanks may have benefited from such a program, upon release, he never showed up.

It would take less than a year for Judge Wade H. McCree to come face to face with Eubanks again – this time, after Eubanks started a police chase, in a stolen vehicle, through a residential neighborhood, before fleeing on foot. (PSR at ¶ 55).

Perhaps the most telling degree of Eubanks' involvement with the YNS gang is his lack of any verifiable employment history. Eubanks is 33 years old. However, throughout his entire adult life, he has no verifiable employment. (PSR at ¶ 105). All the while, Eubanks was a member of YNS from at least 2005, through his arrest in 2017. (PSR at ¶ 19). Eubanks had no verifiable source of income because that was what his YNS gang membership was good for. Eubanks and YNS members' profited at the expense of victims of robberies, home invasions, and individuals struggling with drug addictions.

### c. Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)

The YNS gang didn't just disrespect the laws everyone else in their community lived by. Quite the opposite, they manipulated the free and fair legal system with overt attempts to obstruct justice, intimidate witnesses, and destroy evidence.

As noted above, Eubanks actively engaged in witness tampering after the gang's brutal murder of a random woman—who he referred to as "that b****"—at the Victory Inn motel in the gang's territory. (R. 487: 2/19/2020 Trial Tr., 5625-40, Ex 23.001A-

16

D). Eubanks did not just want to know who was testifying – he wanted the police reports and witness statements to prove it.

This brazen disrespect for the law continued with Eubanks' arrest in West Virginia, where he and Bowens barricaded themselves in a drug house using wood beams, in an attempt to destroy evidence. But Eubanks and Bowens were unsuccessful, and agents' recovered packaged crack-cocaine floating in their bathroom toilet. (PSR at ¶ 29).

The sentence imposed by this Court should reflect the fact that YNS gang members did not just break the law --they actively worked in concert to thwart legitimate law enforcement efforts to solve violent murders and protect the community.

### d. Adequate deterrence and protecting the public from further crimes of the defendant, §§ 3553(a)(2)(B), (C)

This factor includes two components—specific deterrence and general deterrence. Specific deterrence looks to dissuade an individual defendant from committing future crimes, while general deterrence aims to have the same effect on "the population at large." *United States v. Camiscione*, 591 F.3d 823, 834 (6th Cir. 2010).

No previous judicial order, custodial sentence, probation term, treatment plan, or community reentry program, has prevented Eubanks from reoffending. Protecting the public from further crimes committed by Eubanks inherently means imposing a custodial sentence sufficient to protect the community. But so much of what the YNS gang did was targeted directly at recruiting young members of their community. YNS's

17

social media and YouTube videos serve as both marketing and recruiting tools. In Brightmoor, children cannot play at their neighborhood park without being confronted with "YNS DA MOB" or "BMG B****."



The Court doesn't even have to guess whether or not this type of propaganda effected young children in these communities – look no further than the comments on the posts and videos YNS themselves posted:

```
User       justkev1 (876048178) []
Id         17850439093006457
Date Created  2015-08-07 09:19:35 UTC
Status     Active
Text       When you sale drug you live a dream I'm next year when I'm 17
           I'm going to be sale an drugs
```

General deterrence is achieved with sentence that not only protects the community from further crimes of Eubanks and the YNS gang, but also sends the message that if you follow in the footsteps of YNS gang members, you will join them in a federal prison.

## IV. Conclusion

This Court should impose a sentence of 228 months in prison. Such a sentence is sufficient but not greater than necessary.

Respectfully Submitted,

Matthew Schneider
United States Attorney

/s Robert Jerome White
ROBERT JEROME WHITE
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9620
robert.white@usdoj.gov

Date: September 23, 2020

**Certificate of Service**

I hereby certify that on September 23, 2020, I electronically filed the foregoing document with the Clerk of the Court using the ECF system, which will send notification of such filing to the attorneys of record including Victor Mansour.

*/s Robert Jerome White*
ROBERT JEROME WHITE
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9620
robert.white@usdoj.gov