**United States District Court**
**Eastern District of Michigan**
**Southern Division**

| | |
|---|---|
| United States of America, | Criminal No. 17-20184 |
| Plaintiff, | Hon. Judith E. Levy |
| v. | |
| D-7 James Bowens, | |
| Defendant. | |

## Government's Sentencing Memorandum

**I.   Introduction**

Defendant James Bowens is an admitted and convicted associate of one of Detroit's most violent gangs—YNS. The gang has terrorized the beleaguered Brightmoor neighborhood for years, victimizing the poor and vulnerable to extract money and status. Bowens engaged in drug trafficking and earned substantial revenue from drug sales. Bowens expanded the enterprise to rural West Virginia, where police arrested him for 1.2 pounds of crack and two loaded guns. With these firearms, Bowens threatened the lives of A.M. and S.W. Bowens has admitted to his role in the RICO conspiracy—replete with murders, shootings, armed robberies, arson, home invasions, and witness intimidation.

The Court should sentence Bowens to 228 months to reflect the real damage he caused to YNS's victims, their families, and the community.

1

II.  Facts

**Bowens pleads guilty and admits to his involvement in the YNS racketeering conspiracy**

In his plea agreement, Bowens admitted to being a member/associate of YNS—a violent gang engaged in drug trafficking, armed robberies, arsons, and shootings. (R. 505: Rule 11 plea agreement, 7303). Bowens also conspired with YNS leader, Edward Tavorn, and co-defendant, George Eubanks, to distribute a large amount of crack. (*Id.*, 7306). During the conspiracy, Bowens wired or employed others to wire drug proceeds from West Virginia to Detroit, Michigan. (*Id.*, 7305).

Bowens possessed loaded guns through this conspiracy, including the two recovered in West Virginia. He repeatedly used those guns to threaten victims with death if they "snitched" on him. (R. 355: Fourth Superseding Indictment, 1827). He used a loaded gun to kidnap and forced a victim to rent a car to help YNS transport drugs from Detroit to West Virginia. (*Id.*, 1827).

**Trial evidence**

The trial began January 27, 2020. (1/27/2020 Minute entry). On March 12, 2020 after the seventh week of trial, Bowens and his codefendants pleaded guilty to the RICO conspiracy. (R. 505: Rule 11 plea agreement; R. 506: Plea Hr. Tr.). During trial, the government presented dozens of witnesses and hundreds of exhibits detailing the gang's murders, shootings, armed robberies, arsons, home invasions, practice of witness intimidation and obstruction, and extensive drug dealing.

Bowens repeatedly possessed loaded guns and made threats for the enterprise. Bowens pleaded guilty before his West Virginia victims testified—but the grand jury

2

heard a small portion of the evidence and found probable cause that he had violently kidnapped S.W. at gunpoint (count nine) and threatened both S.W. and A.M. (R. 355, 1827, 1833-34). The victims' statements to police show that Bowens threatened to kill A.M.'s child. Here is one trial photo of Bowens with the gun he used against both victims.



(Trial Ex 38.022).

YNS promoted the gang's violence in a YouTube video entitled "Glo-Gang-Member YNS Cheeks – Mobbin with Da Mobb." In the video, the gang bragged about its violent grip on Brightmoor.

- "we killing anything that disrespect us"
- "we got the killas everywhere"
- "we all strapped [armed with guns]"

3

- "we started shooting n*ggas up"
- "YNS . . . now we running this bitch"

(R. 453: 1/28/2020 Trial Tr. 3495-96, Ex 24.001; R. 95-99: Response to Motion for Revocation and Exhibits). Bowens was in the YNS video, "YNS Da Mob – Whats Undestood," where the gang rapped about their violent exploits. (Tr. Ex 26.001).



(Trial Ex. 26.004).

YNS actively engaged in witness tampering after the gang's brutal murder of a random innocent woman—who they referred to as "that bitch"—at the Victory Inn hotel in the gang's territory. (R. 487: 2/19/2020 Trial Tr., 5625-40, Ex 23.001A-D). Defendants did this after learning of the horrific nature of the gang's murder of the woman, captured in part on this 911 call:

**[911 audio]**

4

(R. 487: 2/21/2020 Trial Tr., 5584, Ex 21.005).

While Bowens was on an out-of-state mission to raise "lawyer money" for the gang's leader, West Virginia police arrested him for over 1.2 pounds of crack cocaine and two loaded guns. (R. 501: 3/11/2020 Trial Tr., 7200-01, 7204, 7206-07, Ex 34.001). Here are photos of the crack and his guns—including one with rubber bands on the grip to prevent fingerprints:







6

### Witness intimidation during trial

The gang's witness intimidation and obstruction continued during trial. Two of YNS's shooting victims were too afraid to testify against the gang. (R. 489: 2/24/2020 Trial Tr., 5803). A veteran police officer from Brightmoor received a texted death threat within 36 hours of disclosure of his name as a witness. (*Id.*). The gang communicated threats to two cooperating witnesses and family. (*Id.*, 5803-04). One defendant sent a message that scared one of the cooperating witnesses into first pretending during his testimony that he did not even know them. (*Id.*, 5825-28). YNS gang associates pressed into the courtroom, whenever cooperating witnesses were testifying. (*Id.*, 5804-08). Although Bowens claimed not to know those people, court security officers spotted Bowens communicating with them. (*Id.*, 5804-05).

These acts led the Court to express "serious concerns" about defendants' witness intimidation:

> [W]e do have some serious concerns. There's part of the indictment [that] has an obstruction issue. I mean, all of the things that were listed yesterday at the beginning of the day about [the law enforcement deputy who was threatened], two citizen victims refusing to testify now, the contact with [cooperating witness one]'s mother, the—[cooperating witness one]'s change in demeanor. The communication, nonverbal that seemed to go on with Mr. Bowens and his friend. All these various things . . . But there's enough going on here, jail calls and things where discussions took place about cooperating witnesses. That it's my duty to ensure that everyone is safe in this case and everyone is free to testify.

(R. 490: 2/25/2020 Trial Tr., 6023).

### Bowens pleads guilty and admits he was a YNS leader

In his plea agreement, Bowens admitted to his key role in the violent YNS enterprise. (R. 505: Rule 11 plea agreement). He specifically agreed that he was a leader and organizer, and conceded the 4-point enhancement under USSG § 3B1.1(a). (*Id.*, 7316). His gang (1) "regularly committed robberies . . . while armed, but sometimes would commit unarmed robberies that involved beating their victims." (*Id.*, 7303). They (2) would "break into houses or gain entry at gunpoint and rob victims in the victims' homes." (*Id.*). Bowens admitted that his gang (3) "especially encouraged its members to find firearms to steal, because such firearms could then be used by YNS for future acts of violence and to protect its drug trade." (*Id.*). One example was on May 23, 2016, when YNS members robbed two individuals at gunpoint on Beaverland Street, in the Brightmoor neighborhood of Detroit to obtain firearms. One of those victims testified at trial about the gang holding him and his wife at gunpoint and telling them "I have to kill you now because you've seen my face." (R. 491: 2/26/2020 Trial Tr., 6384).

Bowens's gang (4) "cultivated a reputation for ruthless violence" by "committing crimes including assault, arson, attempted murder, and murder." (R. 505, 7303). Their acts made (5) "YNS a group to be feared and not to be crossed[.]" (*Id.*, 7304). The gang (6) "strictly forbade any cooperation with law enforcement. Gang leadership would confer with members facing charges in order to determine whether any other member might be 'snitching,' or cooperating." (*Id.*).

Bowens (7) had a "status in the enterprise" that allowed him to "enjoy[] the respect and deference of more junior members/associates." (*Id.*). The gang (8)

8

"understood that, if they were to provide information about YNS to the police, they would not only lose standing in the gang but also be subject to violent retaliation up to and including death." (*Id.*). Bowens went further and agreed that he had obstructed the case and conceded the 2-point adjustment under USSG § 3C1.1. (*Id.*, 7316). He was also (9) involved in the distribution of large amounts of crack. (*Id.*, 7306).

### III. Advisory Sentencing Guidelines

The parties agreed in the Rule 11 that Bowens' Guidelines range was 360 months to life in prison (total offense level 42, criminal history category IV). (Rule 11, Guideline Worksheet D). The probation department found a total offense level of 42 and a criminal history category V, resulting in the same Guidelines range. (PSR ¶ 88). The Rule 11 requires that the Court sentence Bowens to at least 168 months (14 years) in prison and caps the sentence at 228 months (19 years). (Rule 11, ¶ 3A).

### IV. Sentencing Guidelines and other 3553(a) factors

Congress has provided, through 18 U.S.C. § 3553(a), the relevant objectives and factors to be considered by sentencing courts in imposing a "sentence sufficient, but not greater than necessary." Those objectives are: (1) the nature and circumstances of the offense, and the history and characteristics of the defendant; (2) the need for a sentence to reflect the basic aims of sentencing (including retribution, deterrence, incapacitation, and rehabilitation); (3) the kinds of sentences legally available; (4) the Sentencing Guidelines; (5) Sentencing Commission policy statements; (6) the need to avoid unwarranted sentencing disparities among defendants with similar records who have

9

been found guilty of similar conduct; and (7) the need for restitution. The most relevant factors are evaluated below.

### A. The advisory Guidelines range

The advisory Guidelines remain an important factor in sentencing. "[I]t is fair to assume that the Guidelines . . . reflect a rough approximation of sentences that might achieve section 3553(a)'s objectives." *United States v. Rita*, 551 U.S. 338, 345 (2007). A district court should begin sentencing proceedings by correctly calculating the guidelines. *United States v. Gall*, 128 S. Ct. 586, 596 (2007).

### B. Nature and circumstances of the offense, and the history and characteristics of the offender, 18 U.S.C. § 3553(a)(1)

#### 1. Nature of the offense

YNS is a violent street gang that "promote[d] its violent reputation through social media posts[.]" (Rule 11, ¶ 1.C). Because of Bowens' status in YNS, he enjoyed the respect and deference of more junior members and associates. Bowens regularly sold drugs with other YNS members throughout the racketeering conspiracy. Bowens extended the enterprise to rural West Virginia where he sold large amounts of crack cocaine for a substantial revenue. During the conspiracy, Bowens wired, or caused to be wired, drug-trafficking proceeds from West Virginia to Detroit, Michigan. Bowens also participated in jail calls with other YNS members in Michigan, which included a discussion of selling drugs in West Virginia and distributing some of the drug-trafficking proceeds to incarcerated YNS leader, Edward Tavorn. Bowens travelled between West Virginia and Detroit, Michigan, to obtain crack cocaine to sell in West Virginia. Bowens

sold that crack cocaine in furtherance of the YNS enterprise. Specifically, his crack proceeds went to help fund the defense of the gang's leader.

YNS purposefully developed its ruthless reputation by committing violent acts. YNS's domination of the neighborhood caused Brightmoor residents to live in fear of shootings, robberies, beatings, and arson. YNS forced the community to endure violence, and the regular use of neighborhood businesses and residences as drug markets, because the gang will not tolerate interference with its members' revenues or threats to its dominance.

Like all YNS members, Bowens is responsible for the foreseeable acts committed by the other members to advance the conspiracy. *United States v. Nicholson*, 716 F. App'x 400, 409 (6th Cir. 2017), c*ert. denied*, 138 S. Ct. 1337 (2018) (applying *Pinkerton v. United States*, 328 U.S. 640, 646-48, (1946) to RICO coconspirators); *see also United States v. Corrado*, 286 F.3d 934, 937 (6th Cir. 2002) (in a "RICO enterprise . . . 'the supporters are as guilty as the perpetrators . . . so long as they share a common purpose, conspirators are liable for the acts of their co-conspirators.'") (quoting *Salinas v. United States*, 522 U.S. 52, 63-64 (1997)). This includes countless acts of violence and drug dealing. These are exactly the harms that "contribut[e] to the economic and social decline of [gang-dominated] neighborhoods" and "caus[e] fear and lifestyle changes among law-abiding residents." *City of Chicago v. Morales*, 527 U.S. 41, 98-99 (1999) (Thomas, J. dissenting) (quoting U.S. Dept. of Justice, Office of Justice Programs, Bureau of Justice Assistance, Monograph: Urban Street Gang Enforcement 3 (1997)). "Gangs fill the daily lives of many of our poorest and most vulnerable citizens with a terror . . . often relegating them

11

to the status of prisoners in their own homes." *Id.* (citing U.S. Dept. of Justice, Attorney General's Report to the President, Coordinated Approach to the Challenge of Gang Violence: A Progress Report 1 (Apr.1996)) ("[For] the families who are hostages within their homes, living in neighborhoods ruled by predatory drug trafficking gangs, the harmful impact of gang violence . . . is both physically and psychologically debilitating"). As the PSR noted, "YNS terrorized and violated the Brightmoor neighborhood for years. In addition, narcotics trafficking destroys neighborhoods and communities with the violence and addictions it brings." (PSR at ¶ 106).

The residents of Brightmoor were the primary victims of YNS's violent dominion throughout the decade-long racketeering conspiracy. This a vulnerable neighborhood that has suffered tremendous population loss and is one of the poorest neighborhoods in Detroit.[1] One 2016 article noted the contrast between the developing areas of Detroit and Brightmoor and found that "[e]ven with a depleted population, crime is still a big issue in this neighborhood[.]"[2] YNS's criminal activity contributed directly to

---

[1] *See* Data Driven Detroit, *Brightmoor Neighborhood Profile* (April 2012). https://ssw.umich.edu/sites/default/files/documents/research/projects/good-neighborhoods/brightmoor-profile-2013-081913.pdf

[2] *See* "*Detroit's most dangerous neighborhoods still struggling during city's comeback*" (February 17, 2016). https://www.mlive.com/news/index.ssf/2016/02/detroits_most_dangerous_neighb.html

12

Brightmoor's high crime rate and its status as "one of the most blighted areas in Detroit."[3]

### 2. History and characteristics

Bowens is a career drug trafficker. Bowens is 39 years old, and has been a convicted drug trafficker for 20 years. (PSR at ¶ 47). He has minimal lawful employment history. (*Id.* at ¶ 85). He possesses guns while selling drugs. *See* (*id.* at ¶¶ 47, 50, 53).

Bowens has had the opportunity to participate in alternative programming. For example, in 2010, Bowens was housed in the Michigan Department of Corrections' Special Alternative Incarceration boot camp. (*Id.* at ¶ 53). Rather than take advantage of this opportunity, Bowens instead conspired to sell heroin and cocaine with another inmate. (*Id.*). And Bowens was still on parole for this conviction when distributing crack in West Virginia for YNS's leader.

### C. Seriousness of the offense, promoting respect for law, and providing just punishment, 18 USC § 3553(a)(2)(A)

The advisory guidelines create a range so the courts can sentence similar defendants appropriately based upon the severity of their conduct.

Bowens's crimes are serious. He negatively affected a poor, rural community riddled with drug addiction. *See* (*id.* at ¶ 106). He organized transportation of enough crack to get the entire city of Williamson, West Virginia high. He organized and

---

[3] *See* "*Detroit area's battle with blight may be key to survival*" (July 25, 2013). https://www.reuters.com/article/us-usa-detroit-blight/detroit-areas-battle-with-blight-may-be-key-to-survival-idUSBRE96O02T20130725

13

managed a drug-trafficking ring in West Virginia, which involved transporting drugs and drug proceeds between West Virginia and Detroit. (*Id.* at ¶ 22).

Not only does Bowens sell drugs, he uses guns to further his drug trafficking. He carried and possessed loaded firearms to protect his drugs, drug proceeds, and to threaten others. Bowens threatened at least two victims to prevent them from "snitching" about his drug-trafficking ring in West Virginia. (*Id.* at ¶ 23).

Bowens's criminal history shows his lack of respect for the law. Repeatedly, while on parole, Bowens continued to traffic drugs. (*Id.* at ¶¶ 50, 53). His attempts to obstruct justice and intimidate witnesses further show his blatant disrespect for the law. He threatened to kill "snitches." And he communicated with a member of the public attending trial, which led the Court to express its "serious concerns" about obstruction. (R. 490: 2/25/2020 Trial Tr., 6023).

## D. Adequate deterrence and protecting the public from further crimes of the defendant, §3553(a)(2)(B) and (C)

Deterrence is especially important in this case. In the past, courts gave Bowens breaks and he has served little time considering his criminal history. He responded by committing new crimes. The Court must deter Bowens from possessing guns, selling drugs, and participating in a racketeering conspiracy.

## V. Conclusion

The government recommends that the Court impose a sentence to reflect the real damage Bowens caused to YNS's victims, their families, and the community.

Matthew Schneider
United States Attorney

*s/Danielle Asher*
DANIELLE ASHER
Assistant United States Attorney
211 West Fort Street, Suite 2001
Detroit, Michigan 48226-3211
(313) 226-9518
danielle.asher@usdoj.gov

Dated: October 14, 2020

15

**<u>Certificate of Service</u>**

I hereby certify that on October 14, 2020, I electronically filed the foregoing document under seal with the Clerk of the Court and will provide a copy of such filing to the attorneys of record, James Amberg.

                                              */s Danielle Asher*
                                              DANIELLE ASHER
                                              Assistant United States Attorney
                                              211 West Fort Street, Suite 2001
                                              Detroit, Michigan 48226
                                              (313) 226-9518
                                              danielle.asher@usdoj.gov